UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


MACTEC, INC.,                          )
                                       )
                Plaintiff,             )
                                       )
v.                                     )          No. 3:05-cv-340
                                       )          (Phillips/Shirley)
BECHTEL JACOBS COMPANY, LLC,           )
                                       )
                Defendant.             )


## MEMORANDUM & ORDER

This matter is before the undersigned pursuant to 28 U.S.C. § 636(b), the Rules of

this Court, and by Order [Doc. 31] of the Honorable Thomas W. Phillips, United States District

Judge, for disposition of Plaintiff MACTEC, Inc's Motion for Protective Order and Expedited

Discovery [Doc. 29].  The undersigned conducted an expedited hearing on this matter on January

18, 2006.

This is a contract dispute.  The defendant Bechtel Jacobs Company, LLC ("BJC")

is under contract with the United States Department of Energy, Oak Ridge Operations Office

("DOE-ORO") to complete certain environmental restoration and cleanup work at the DOL-ORO

Oak Ridge Site, known as the Melton Valley Closure Project.  Part of this work involves the

hydrologic isolation of an area referred to as Solid Waste Storage Area-4 ("SWSA-4").  The plaintiff

MACTEC, Inc. ("MACTEC") entered into a subcontract with the defendant by which the plaintiff

would design and construct a hydrologic isolation system for the SWSA-4. The hydrologic isolation

system included the construction of an upgradient trench, a multi-layer cap, and a downgradient

drain, which is also referred to by the parties as a downgradient trench ("DGT"). In this civil action, MACTEC alleges that BJC has failed and refused to pay for MACTEC's work in designing and constructing the DGT. It is the position of BJC that the DGT does not function properly, and that because of the plaintiff's faulty construction, the DGT will not capture contaminated groundwater flowing from the SWSA-4 site.

This matter initially came before the undersigned on August 17, 2005 on the defendant's motion for protective order. The defendant's motion sought leave to proceed with the corrective work it contended was necessary to complete the SWSA-4 project or, in the alternative, for an order allowing the parties to engage in expedited discovery so that the defendant then could move forward with completing the project by September 30, 2006. [Doc. 4]. At the hearing on the motion, the defendant withdrew its request to proceed with corrective work on the DGT and instead proposed that expedited testing be done. The Court withheld ruling on the defendant's motion in order to allow the parties to meet and confer on a plan to conduct non-destructive testing. A telephone conference was held on September 7, 2005, at which time the parties advised the Court that they required additional time to work out a mutually agreeable testing plan. Subsequently, the defendant advised the Court that the parties had agreed upon the terms of the proposed non-destructive testing. The defendant subsequently withdrew its motion for a protective order, and an Order was entered deeming the defendant's motion withdrawn. [See Doc. 23].

On January 8, 2006, the plaintiff MACTEC filed the present motion [Doc. 29], seeking a protective order and an order authorizing expedited discovery to preserve evidence. The plaintiff also filed a motion [Doc. 28], seeking an expedited hearing on this matter. A hearing was

2

held by the undersigned on the plaintiff's motion for protective order [Doc. 29] on January 18, 2006. Accordingly, the motion for an expedited hearing [Doc. 28] is **GRANTED**.

In its motion, MACTEC alleges that BJC recently completed over four months of testing on the DGT and unilaterally has decided to proceed with corrective work on the DGT without allowing MACTEC to do any independent testing on the DGT. MACTEC alleges that the corrective work proposed by BJC will destroy the existing state of the trench system, will preclude the plaintiff from performing its own tests, and will therefore preclude the plaintiff from obtaining empirical evidence and analyses in order to support its claim that the hydrologic isolation system as constructed meets and/or exceeds the performance criteria set forth in the parties' contract.

The defendant opposes the plaintiff's motion, arguing that it must proceed with corrective work immediately in order to complete the Melton Valley Closure Project ("Project") by the contracted completion date. The defendant further argues (1) that the parties' contract expressly provides that BJC has the right to correct defective work; (2) that a protective order cannot afford the relief the plaintiff requests; (3) that the motion improperly seeks injunctive relief in the guise of a protective order; and (4) that there is no basis for the injunctive relief sought by the plaintiff.

BJC's contract with DOE provides significant financial incentives for early completion of the Project and even larger disincentives for late completion. Specifically, BJC will forfeit $66,667 per day, or $2,000,000 per month, in fees if the Project is completed after September 30, 2006, and BJC will earn an additional $33,000 per day, or $1,000,000 per month, in fees if the project is completed before September 30, 2006. BJC contends that the Project is scheduled for completion prior to September 30, 2006, and will be completed prior to that date but for the completion of the work related to the DGT. BJC argues that financial incentives and disincentives

tied to the completion of the project are a reflection of the significant health and environmental benefits that DOE associates with achieving the earliest possible completion of the Project and thus stemming the release of contaminated materials from the site.

BJC contends that the Project is currently scheduled for completion in June 2006. However, in order to complete the Project, BJC contends that it must remedy the defects in the plaintiff's work immediately, test the operation of the completed work during the 2005-2006 wet season, which runs from November 1, 2005 to March 31, 2006, and obtain acceptance of the completed work by DOE, EPA, and TDEC. BJC has submitted the affidavit of Paul Clay, the general manager of BJC, who states that BJC has presented the results of BJC's pump tests to the environmental regulators and that the regulators have informally indicated to BJC that the DGT, as currently constructed, will not be accepted. Mr. Clay further states that the regulators have informed BJC that if the corrective action proposed by BJC is implemented immediately and operated throughout the remainder of the wet season, and if the data from the wet season operations support the effectiveness of the corrective action, the regulators will approve completion of the project some time in the Spring of 2006. BJC argues that if adequate wet season data that confirms the ability of the DGT to function successfully cannot be obtained within in the next few months, BJC will need to wait for the next wet season in 2006-2007 in order to demonstrate the success of the repair and to obtain regulatory approval of the SWSA-4 remediation. If that occurs, and approval is delayed until the first of May, 2007, BJC will lose approximately $17,000,000. [Doc. 34 Ex. 1].

The plaintiff argues that the Court has authority under Rule 26(c) of the Federal Rules of Civil Procedure to issue a protective order to require BJC to preserve the tangible evidence, *i.e.*, the trench as it was constructed, until such time as the plaintiff has an opportunity to inspect and test

it. The plaintiff further contends that since the Fall of 2004 it has repeatedly requested of BJC – and has repeatedly been denied – the opportunity to conduct a slow flow, long duration testing as provided for in the parties' contract. In short, the plaintiff argues that it is entitled to operate the system as intended and measure its performance against the performance criteria set forth in the parties' contract, and that such a test would be the only true indicator of the system's construction.

The plaintiff contends that the testing it proposes to do is substantially different from the testing performed by BJC in the previous four months. One significant difference is the proposed duration of the testing. The plaintiff argues that a longer duration test (of up to six months) will allow true equilibrium (an equal amount of water coming into the DGT as is going out) to occur. The plaintiff contends that the pump tests run by BJC were of short duration and did not allow for true equilibrium to occur within each trench segment, and therefore, BJC's tests cannot establish whether the system meets the performance criteria. In support of this argument, the plaintiff submits the Declaration of Ronald Lewis, a Principal Engineer with MACTEC. Mr. Lewis has reviewed the data from BJC's pumping test and is of the opinion that short-term tests, such as those performed by BJC, do not fully establish the maximum capability of the trench to establish inward gradients and prevent SWSA-4 affected groundwater from discharging to the intermediate holding pond. Mr. Lewis opines that the effectiveness of the system can only truly be determined by longer-term operation of the trench, such as proposed by the plaintiff in its test procedures. [Doc. 37 Ex. 3].

The plaintiff seeks relief pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, which provides that the Court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed. R. Civ. P. 26(c). The Rule goes on to provide a list of the various types of relief that the Court may

award the moving party, including that the requested discovery not be had, or that discovery be conducted only on certain terms and conditions. See id. (1)-(8). While such remedies are not exclusive, they are illustrative of the types of remedies the Rule contemplates. It is clear from this list of remedies that the Rule is intended to operate as a shield to protect litigant from abusive or overreaching discovery tactics. In the present case, however, the plaintiff is not seeking protection from "annoyance, embarrassment, oppression, or undue burden or expense." The plaintiff is not seeking a "shield" from onerous discovery; rather, the plaintiff seeks to use Rule 26(c) as a sword to prevent the defendant from invoking its contractual right to take any corrective measures and to enable the plaintiff to conduct the type of testing that it contends that it is entitled to conduct under the parties' contract. This Court finds that such is simply not the purpose of Rule 26(c), and is more akin to a request for injunctive relief which has not technically been sought in this case.

The Court further finds that, to the extent that the plaintiff's request constitutes a discovery request, it is more in the nature of a request under Rule 34, which provides that a party may request permission to enter upon "designated land or other property . . . for the purpose of inspection and measuring, . . . testing, or sampling the property or any designated object or operation thereon, within the scope of Rule 26(b)." Fed. R. Civ. P. 34(a). However, a Rule 34 request to enter upon land for the purpose of conducting testing requires that the request be made of a party, with regard to property in the possession or control of that party, and that the party making the request specify a "reasonable time, place, and manner of making the inspection and performing the related acts." Fed. R. Civ. P. 34(b). In the present case, the defendant argues that the property in question is owned by DOE and not the defendant. The Court need not make a ruling as to this issue, however, because the Court finds that the plaintiff's request fails to specify a reasonable time for

6

the requested testing. The plaintiff asserts that it needs a minimum of six months in order to run the tests necessary to demonstrate that the DGT as constructed is operable and satisfies the performance criteria of the parties' contract. The defendant, on the other hand, has proposed modifying the DGT, running tests to collect adequate wet season data, and seeking (and obtaining) regulatory approval of the DGT by the Spring of 2006, months before the plaintiff's proposed testing would even be completed. In light of the multiple activities that the defendant has proposed to do in a matter of a few months, it strikes the Court as unreasonable that the plaintiff proposes to take six months just to conduct testing.

The Court further finds that permitting such a lengthy amount of time for testing would be unreasonable in light of the deadlines that the defendant currently faces. The defendant must obtain wet season data in order to obtain regulatory approval for the Project. The wet season lasts from November to March. Thus, if the defendant is unable to obtain adequate wet season data by the end of March 2006, it will be unable to obtain regulatory approval this year and will therefore not meet its target completion date of September, 2006. BJC will then need to wait for the next wet season in 2006-2007 in order to demonstrate the success of the DGT and to obtain regulatory approval. If approval is delayed until May, 2007, BJC will lose approximately $17,000,000. As BJC stands to lose millions of dollars if the Project is delayed for an additional six months, the Court finds that the plaintiff's request to conduct six months of testing poses an undue burden on the defendant.

While the Court is aware that the plaintiff has made efforts via requests to BJC to conduct testing on the DGT, even before commencing this litigation, and that these attempts were refuted by the defendant, the Court finds that the plaintiff has acted unreasonably in waiting until

7

now to raise this issue with the Court. This litigation was filed in July, 2005. By that time, the plaintiff had twice requested an opportunity to test the DGT and had twice been denied. The plaintiff knew or should have known at the time of filing this lawsuit or shortly thereafter that an extensive amount of time would be needed in order to complete the testing it desired. As such, the testing that the plaintiff now seeks should have been immediately requested with the filing of the complaint or shortly thereafter. This is especially true in light of the fact that the parties were before the undersigned in August, 2005 and that the parties' need for testing and the need for a testing schedule were being discussed. The primary subject of these hearings was the nature and extent of the defendant's testing; no mention was made to the Court of the plaintiff's desire for testing. The Court finds that such should have been raised at that time. The Court was left with the impression that it was dealing with all testing issues involved in this matter. Following these hearings, the parties were instructed to meet and confer regarding an agreed resolution of the testing issue. The parties advised the Court thereafter that they had resolved the testing issue, and the defendant withdrew its motion. Because the Court expected the parties to resolve all issues regarding testing, the Court thought that the parties had done so. However, the plaintiff did not at that time, or at any time prior to filing its motion on January 8, 2006, alert the Court to the fact that it would seek independent testing or that it would require six months to complete its testing. Simply put, the plaintiff should have raised this issue months ago when there was still conceivably time to plan for such testing. In light of the present circumstances and the impending deadlines facing the defendant, however, the Court finds that it would be unreasonable to permit such lengthy testing now.

8

For these reasons, the Plaintiff's Motion for Protective Order and Expedited Discovery [Doc. 29] is **DENIED**.

**IT IS SO ORDERED.**

ENTER:

___s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge